UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION and
PEOPLE OF THE STATE OF NEW YORK, by
ERIC T. SCHNEIDERMAN, Attorney General
of the State of New York,

                      Plaintiffs,

     v.                                  **DECISION AND ORDER**
                                          15-CV-006S

VANTAGE POINT SERVICES, LLC, et al.

                      Defendants.

## I. INTRODUCTION

Plaintiffs, the Federal Trade Commission and the New York State Attorney General, commenced this action under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b) ("FTCA"); Section 814 of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692l; New York Executive Law § 63(12); and New York General Business Law § 349 and § 602 for Defendants' alleged abusive and deceptive debt collection practices. Plaintiffs seek, among other things, injunctive relief, restitution, and disgorgement of ill-gotten monies.

In the Complaint, Plaintiffs allege that Defendants, in their efforts to collect on debts, are jointly and severally liable for: (1) making false representations to consumers[1] regarding Defendants' identities, location, and business purposes, including stating that they are calling from or on behalf of a law firm or government agency; (2) falsely threatening debtors with arrest on criminal charges, the filing of a civil suit, or

---

[1] As defined in the FDCPA, and as used in Plaintiffs' pleadings, "consumer" refers to a "person obligated or allegedly obligated to pay any debt." (Compl ¶ 46); 15 U.S.C. § 1692a(3).

similar consequences for non-payment; (3) making unlawful contact with third parties (such as family, friends, and employers) and disclosing information, including false information such as impending arrest, about the purported debt; (4) failing to provide consumers with statutorily required information; and (5) charging consumers illegal processing fees.

Defendant Vantage Point Services LLC was formed by Defendant Megan VanDeViver in March 2008. (Davis Decl PX01 Ex A.[2]) In 2010, VanDeViver sold her ownership interest in Vantage to Defendant Greg MacKinnon for ten dollars ($10.00). (Vacco Decl Ex 1.) She subsequently remained a signatory on Vantage Point's bank accounts, however, and MacKinnon was not added as a signatory until June 2011. (Davis Decl PX01 Ex S.) Further, Defendant Angela Burdorf became a partner and officer in Vantage Point in June 2012. (Davis Decl PX01 Ex XX.)  Although 636 North French Road, Suites 7 and 8, Amherst, New York appears to be Vantage Point's primary physical location (Peters Decl PX03 ¶¶ 7-10; Kennuth Decl ¶ 3; see Davis Decl Ex S), at different times this Defendant has also held itself out as doing business from 121 Willow Drive, Tonawanda, New York; 4248 Ridge Lea Road, Suite 45, Amherst, New York; and pays rent for 7948 Baymeadows Way, Jacksonville, Florida. (Davis Decl PX01 Exs A, H, J, Ex FF, XX.)

Defendant Payment Management Solutions, Inc., was incorporated in New York on December 12, 2012, and has operated under Defendant Burdorf as the principal member. (Davis Decl PX01 Exs B, O, T-V.)   Defendants assert that Payment Management's principal place of business was 10325 Lockport Road, Niagara Falls, a

---

[2] Plaintiffs' submissions in support of the TRO and Motion for a Preliminary Injunction are numbered by declaration (PX01-PX31 (TRO), PX32-PX48 (Preliminary Injunction)).

building which also houses several debt collection companies.  (McCollister Decl ¶¶ 3-7; Greenman Decl ¶¶ 11-12.)  Payment Management has also held itself out as operating from 4248 Ridge Lea Road, Suite 45, Amherst, New York. (Davis Decl PX01 Exs P, R, T-V, TT.)  This Defendant, however, operated out of the North French Road office for an unspecified amount of time prior to the commencement of this action. (McCollister Decl ¶ 2.) Defendant Burdorf also formed Solidified Payment Solutions, LLC on July 14, 2014, a company which has received several wire transfers from Payment Management Solutions and wired almost the same amount out to Vantage Point. (Davis Decl PX01 ¶¶ 24 Ex C.)

Defendant Bonified Payment Solutions, Inc., was formed by Defendant Joseph Ciffa and incorporated in New York State on June 13, 2014.  (Davis Decl PX01 Ex F; Greenman Decl ¶¶ 16-17.[3]) Bonified Payment's primary address is also 10325 Lockport Road, where Ciffa asserts he rented space along with phone services from Defendant MacKinnon. (Greenman Decl ¶ 11.)

On January 5, 2015, this Court granted Plaintiffs' *ex parte* motion for a temporary restraining order ("TRO") with an asset freeze and appointment of a Receiver to oversee the named Corporate Defendants and their assets, subsidiaries, and affiliates, including accounts held by Solidified Payment Solutions, LLC and Vision Asset Management Group, LLC.  Pursuant to the authority granted by the TRO, Plaintiffs and the Receiver entered the Lockport, North French Road, and Jacksonville premises on January 7, 2015, and the Receiver took control of the Corporate Defendants and related entities.

---

[3] Defendant Ciffa adopted the statements made by his counsel in their entirety.  (Ciffa Decl ¶ 3, Docket No. 44-1.)

Presently before this Court is Plaintiffs' motion for a preliminary injunction with a continued asset freeze.  For the reasons that follow, Plaintiffs' motion is granted.

## II. DISCUSSION

**A.      Preliminary Injunction Standard**

The standard for obtaining a preliminary injunction under the FTCA differs from that applicable to private applicants seeking such relief. See F.T.C. v. Crescent Publ'g Grp., Inc., 129 F. Supp. 2d 311, 319 (S.D.N.Y. 2001) (citing U.S. v. Sun and Sand Imports, Ltd., Inc., 725 F.2d 184, 188 (2d Cir. 1984)); see also F.T.C. v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988). Plaintiffs are entitled to a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). Under this public interest test, "private concerns may certainly be considered, [but] public equities must receive far greater weight." World Travel Vacation Brokers, Inc., 861 F.2d at 1029; see Sun and Sand Imports, Ltd., Inc., 725 F.2d at 188   (under the FTCA, the equities should weigh in favor of a preliminary injunction); F.T.C. v. Weyerhaeuser Co., 665 F.2d 1072, 1083 (D.C. Cir. 1981) ("When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone would not suffice to justify denial of a preliminary injunction."); see also Crescent Publ'g Grp., Inc., 129 F. Supp. 2d at 319; F.T.C. v. Phoenix Avatar, LLC, No. 04 C 2897, 2004 WL 1746698, *8 (N.D. Ill. July 30, 2004).   Thus, the FTC does not have to show irreparable harm, but instead a court should: (1) determine whether the FTC has a fair and tenable chance of ultimate success on the merits; and (2) consider the equities of imposing injunctive relief.

Crescent Publ'g Grp., Inc., 129 F. Supp. 2d at 319; see also People v. Apple Health & Sports Clubs, 174 A.D.2d 438, 571 N.Y.S.2d 23 (N.Y.A.D. 1st Dep't 1991) (applying similar standard in special proceeding pursuant to N.Y. Executive Law § 63), aff'd 80 N.Y.2d 803 (1992).

## B.    Exclusion of Consumer Declarations

In considering Plaintiffs' motion, Defendants argue that this Court should disregard the consumer declarations submitted in support of the TRO and incorporated by reference into Plaintiffs' present submissions. (Defs' Mem in Opp'n at 6-8;[4] see PX05-PX15, PX18-PX30.) Specifically, Defendants assert that these declarations appear to have been prepared by FTC agents and not the consumers themselves. Although the declarations are similar in format, they do not contain rote repetitions of general allegations, but instead each declaration reflects a consumer's relevant experience with an improper debt collection or attempted collection. The declarations are also supported by voicemail transcripts and/or letters received by the consumer.

Further, although Defendants argue that the allegations in these declarations have not been subject to cross-examination, "[t]he Supreme Court has observed that the decision of whether to award preliminary injunctive relief is often based on 'procedures that are less formal and evidence that is less complete than in a trial on the merits.' " Mullins v. City of New York, 626 F.3d 47, 51-52 (2d Cir. 2010) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981)). Accordingly, the consumer declarations are appropriately considered on a preliminary injunction motion. Mullins, 626 F.3d at 52; see Davis v. N.Y.C. Hous. Auth., 166 F.3d

---

[4] Defendants Ciffa and Bonified joined in the memorandum submitted on behalf of the other Defendants. (Docket Nos. 45, 49, 52.)

432, 437-38 (2d Cir. 1999).  Further, because Defendants neither expressly discuss nor dispute the factual assertions in the consumer declarations, or in fact much of the specific evidence cited by Plaintiffs, resolution of this motion on the parties' submissions will not be the result of an improper 'battle of the affidavits.'[5]  See Davis, 166 F.3d at 437-38 (where affidavits evince disputed issues of fact, an evidentiary hearing is preferred).

## C.  Common Enterprise

Plaintiffs are proceeding against Defendants collectively under a common enterprise theory, under which "each entity within a set of interrelated companies may be held jointly and severally liable for the actions of other entities that are part of the group." F.T.C. v Tax Club, Inc., 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014).  To determine whether common enterprise, or a "maze of interrelated companies," exists, courts consider "the pattern and framework of the whole enterprise." Delaware Watch Co. v. F.T.C., 332 F.2d 745, 746 (2d Cir. 1964). Relevant factors include whether the corporate defendants "(1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." Tax Club, Inc., 994 F. Supp. 2d at 469 (citation omitted).  Further, a common enterprise analysis is neither an alter ego inquiry nor an issue of corporate veil piercing; instead, the entities within the enterprise may be separate and distinct

---

[5] Attorney Vacco's supporting declaration (Docket No. 46) contains a narrative description of the manner in which Defendants operated.  However, counsel's assertions do not appear to be based on personal knowledge, and, with the exception of a few exhibits which are discussed herein as relevant, it is unclear what specifically constitutes the basis for counsel's statements. Further, the statements are largely general in nature. Accordingly, even taking into account the more relaxed standard for submissions on a preliminary injunction motion, Mullins, 626 F.3d at 51-52, this Court finds the declaration "more akin to an adversarial memorandum than a bona fide [declaration]" Smeraldo v. City of Jamestown, 512 F. App'x 32, 34 (2d Cir. 2013) (internal quotation marks omitted); see Country Fare LLC v. Lucerne Farms, No. 3:11cv722 (VLB), 2011 WL 2222315, *9 (D. Conn. June 7, 2011) (affidavits made on information and belief considered insufficient even at the preliminary injunction stage).

corporations. <u>F.T.C. v Wyndham Worldwide Corp.</u>, No. 13-1887(ES), 2014 WL 2812049 *5 (D. N.J. June 23, 2014) (citing <u>F.T.C. v. Direct Benefits Grp.</u>, No. 11-1186, 2013 WL 3771322, *18 (M.D. Fla. July 18, 2013)).

Plaintiffs argue that the distinctions between the entities at issue in this case are engaged in a single debt-collection enterprise, and the corporate distinctions between them are merely nominal. In opposition, Defendants argue that the Corporate Defendants and third-party debt collection agencies are separate and distinct entities, each of which operates independently, manages its own staff, and performs its own function, albeit at times for one or more of the other Corporate Defendants, but then by way of an arms-length contract.

Defendants do not dispute that the three Corporate Defendants operated out of the same Lockport and North French Road addresses, but argue instead that the companies had separate and distinct office spaces within those locations. (Defs' Mem in Opp'n at 5; Kenneth Decl ¶ 7; McCollister Decl ¶ 7; Greenman Decl ¶¶ 11-12.) However, even crediting Defendants' assertions that each entity had a physically distinct office or suite[6] (<u>see</u> Kennuth Decl ¶ 4 (alleging the door between the suites of Vantage Point and "the non-defendant debt collection company" was kept closed); McCollister Decl ¶ 6 (door kept closed between Payment Management and the debt-collection tenants)), this Court finds that the evidence related to the shared locations supports the conclusion that a common enterprise exists between the entities.

---

[6] This assertion is hard to reconcile with Plaintiffs' evidence of the close layout of the relevant spaces and the number of "separate" entities that are alleged to have operated in each. (<u>compare</u> Greenman Decl ¶ 12 (asserting the Lockport Road space houses five separate and distinct entities) <u>with</u> Peters Decl PX 33 ¶ 4 Ex A (Lockport Road diagram and description of location as converted residential home within which all spaces were accessible to all employees); <u>see generally</u> Receiver's Report ¶ 13, Docket No. 30 (observing no clear areas of demarcation in either Buffalo location).

Defendants allege that the separate corporate entities paid rent, utilities, and related expenses by way of arms-length agreements. (Kennuth Decl ¶ 7; Greenman Decl ¶¶ 11-12; Vacco Decl ¶¶ 37-38, 51.) No evidence of written agreements has been submitted, and almost no details regarding the specifics of these rental arrangements have been offered. Defendant Ciffa does assert that he made monthly payments of $1200 for rent and $500 for use of the phone system, (Greenman Decl ¶ 12), but he does not address Plaintiffs' evidence that none of the checks made from Bonified's bank accounts during the six months after its formation appeared to be for utilities, rent, or office expenses. (Davis Decl PX01 ¶ 33.) Further, although Vantage Point did not own the Lockport property, Bonified and the other nominally separate entities allegedly paid rent not to the building's landlord,[7] but to Vantage Point. (Greenman Decl ¶ 11; Vacco Decl ¶¶ 37-38, 51; see Davis Decl PX01 ¶ 41 Ex KK.)  Defendants also do not dispute that Payment Management was sharing Vantage Point's North French Road space, but argue this was a temporary arrangement "because of prolonged internet issues at the Payment Management Solutions' office space on Lockport Road." (Kennuth Decl ¶ 2; McCollister Decl ¶ 2.)  No detail is offered on how long this temporary arrangement has been in place, and Defendants do not assert that Payment Management paid any additional rent to Vantage.

Further, the identified debt collection companies operating in the Vantage Point locations are run by current or former employees of Defendants.  Northwest Capital Solutions, LLC, the debt collection company occupying one of the two suites in the North French Road location, was formed by Pamela Lizak in September 2014, at which

---

[7] In any event, the landlord is either Defendant MacKinnon's brother or nephew.  (see Receiver's Rpt ¶ 14; Greenman Decl ¶ 9; Vacco Decl ¶ 66.)

time Lizak was still listed on Vantage Point's payroll. (Davis Decl PX01 ¶ 8(d) Exs E, K, BB.) Defendant Ciffa was directly employed by Vantage Point in 2013 prior to starting a debt collection operation out of Vantage Point's Lockport Road space. (Greenman Decl ¶¶ 9-11.) He then formed Bonified Payment in response to a request from Defendant MacKinnon to process debt collection payments. (Greenman Decl ¶¶ 9, 16, 17.)

Notably, Defendants do not address the bank records referenced by Plaintiffs, or indeed much of the evidence submitted in support of the present motion.[8] Contrary to Defendants' assertion that there is no evidence of common control over debt collection activities, (Defs' Mem in Opp'n at 4), former Vantage Point employee Christa Platts stated that Defendant MacKinnon participated in the hiring, scheduling, and paying of collectors, including bringing in a "supervisor from another location" to train Vantage Point collectors on using high pressure tactics to obtain results. (Platts Decl PX35 ¶¶ 2-5, 7-11; see Receiver's Rpt ¶ 22; Budich Decl PX37 Ex CR (business address for supervisor's company also listed as North French Road).) Platts further stated that MacKinnon would direct which office alias (such as International Mediation or International Recovery) or which payment processing company was to be used by the collectors. (Platts Decl PX 35 ¶¶ 4-5.)

Further, although Defendant Ciffa asserts that the TRO was executed "before a single penny could be processed by Bonified," (Greenman Decl ¶ 17), bank records reveal that Ciffa was receiving frequent checks from Payment Management and Solidified following Bonified's formation in June 2014, and that "dozens" of checks were

---

[8] Defendants assert that they "have not had an opportunity to obtain relevant documents and related materials to defend themselves." (Vacco Decl ¶ 121.) However, neither the present submissions nor prior discussions with the Court during status conferences have clarified what evidence Defendants believe exists, but is being improperly withheld. Notably, Defendants consented to the briefing schedule on the present motion and did not move for an extension. (see Docket No. 26.)

issued from Bonified's "payroll" account to various individuals. (Davis Decl PX01 ¶¶ 31, 33.) Thus, although Bonified may not have been processing consumer payments through MoneyGram (Greenman Decl ¶ 17), the record suggests that, as Plaintiffs argue, these Defendants were nonetheless cooperating in debt collection efforts with the other named Defendants. (Pls Mem of Law at 9; see e.g. Budich Decl ¶ 20 Ex DC (improper debt collection script sent to Defendant Ciffa.)

Additionally, improper "shake message scripts," talk off scripts, Vantage Point dunning letters, and lists of corporate aliases and phone numbers were found throughout the Lockport, North French Road, and Jacksonville locations, including in the individual offices of Vantage Point's MacKinnon, Kennuth, and Christine Kensinger, and Payment Management's Burdorf and James McCollister (Davis Decl PX01 Ex K; Hill Decl PX32 Ex A; Peters Decl PX 33 Ex A; Davis Decl PX34 ¶¶ 6-9, 11-19 Exs C-I). Similar documentation was found throughout the seized Jacksonville office. (Budich Decl ¶¶ 7-13 Exs D, K, N, Z-BR.) Electronic records from all of the sites (Budich Decl PX37 ¶ 14-20) indicate regular communication between the various entities regarding, among other things, time cards for employees (id. at Ex BY); collection activity and complaint management, including discussion of law enforcement threats made to consumers (id. at Exs CC-CD, CG, CH, CJ, CS, CV, CX, CZ); borrowing an employee between entities (id. at BZ); Defendant Ciffa's operation under the Stateside and Northern Mediation aliases (id. at Exs N, BR, CA,  CC1); and collection scripts utilizing improper practices (id. at Exs DB-DF).  In their opposition, Defendants address almost none of this evidence. An exception is the assertion that Vantage Point is "investigating" whether or not the returned dunning letters, which indicate they were sent on Vantage

Point's behalf and were found in a Vantage Point office, "were actually sent by a Vantage Point employee." (Kennuth Decl ¶ 8-10; see Davis Decl PX34 ¶ 20Ex J.)  This assertion is not a denial, and does not raise a factual issue requiring resolution.

Further, the billing contact for each of the six phone accounts associated with a Corporate Defendant or another entity sharing a Vantage Point location is either Defendant MacKinnon or Vantage Point employee Rebecca Werth, which is particularly notable where the billing records reveal these entities have used up to 423 different phone numbers with 90 different area codes. (Davis Decl PX01 ¶¶ 65-67 Ex K.) Defendant Ciffa is the telephone account administrator for the phone system in the Lockport Road offices, including the account which Plaintiffs' analyst concluded has an 80% incidence rate for calls containing false representations and over a 50% incidence rate for calls with explicit threats of arrest or detainment. [9] (Greenman Decl ¶ 19; Rodrigues Decl PX36 ¶¶ 15-21; McAlvanah Decl PX39 ¶¶ 6-8.)

In contrast, there is almost no evidence that the entities performed separate functions by way of arms-length agreements.  Defendants do not dispute that there are no written rental contracts, and the record reflects only one check from Northwest Capital that appears to be for rent despite the number of entities purportedly renting space and utilities from Vantage Point. (Davis Decl PX01 ¶ 41 Ex KK.) As Plaintiffs note, the few collection agreements submitted by Defendants are unexecuted. (see Vacco Decl Ex 3.)

---

[9] For the purposes of the present motion, the Court finds no reason to question Defendant Ciffa's assertion that he was not the person responsible for deleting the recordings from this account that were later recovered by Plaintiffs.  (see Greenman Decl ¶¶ 19-20.)  Nonetheless, the fact that the "account was accessible with a password that was made available to almost everyone in the office" (id. ¶ 20) weighs against finding that the entities at Lockport Road operated separately and distinctly.

Defendants assert that Vantage Point would stop doing business with a third party collection agency that generated a high number of consumer complaints (Kennuth Decl ¶ 15); however, no specific example or supporting evidence of such a termination has been provided.[10]   Instead, as Plaintiffs argue, the evidence suggests a pattern of forming a new corporate entity under an employee or associated individual when the number of consumer complaints threatened the enterprise's continued ability to collect funds using money transfer services such as MoneyGram.   For example, although Payment Management Solutions applied for a MoneyGram account to accept consumer payments in April 2013, all but one of this entity's 6363 account transactions occurred after August 30, 2013, the date MoneyGram terminated Vantage Point's account due to excessive consumer complaints. (Davis Decl PX01 ¶¶ 50-55 Exs QQ, RR.)   The Receiver similarly noted that the formation of Bonified by Defendant Ciffa, a former Vantage Point employee, "somewhat coincides with Vantage Point's loss of access to the Payment Intermediaries Pathfinder/Global due to excessive chargebacks." (Receiver's Rpt ¶ 22.)

The Court also gives significant weight to the fact that the participation of each nominally separate entity -- Vantage Point, Payment Management Solutions, and a "third party debt collector" such as Bonified or Northwest -- is necessary in order to collect on any single individual debt even when operating as described by Defendants. A third party debt collector would not collect on a debt and then remit a portion of those funds back to Vantage Point, as would be expected from a traditional contingency relationship. (see Pls' Mem of Law at 9; Receiver's Rpt ¶ 22 n. 6; Vacco ¶¶ 55-61.)

---

[10] In any event, several consumers reported receiving collection calls from Vantage Point directly. (PX18, PX 20, PX22, PX24, PX29.)

Instead, once an initial agreement to pay was obtained, the consumer would be transferred to Vantage Point Services or Payment Management Solutions to authorize the payment, which would be made to one of these two companies. (Pls' Mem of Law at 4-5; <u>see</u> Vacco Decl ¶ 58; <u>see e.g.</u> PX05, PX06, PX08.) Defendants even argue that payment was not made to the third party collector directly so that Vantage Point could retain control of the funds and prevent being "cheated out of revenue." (Vacco Decl ¶ 55.)  In light of this, as well as the shared spaces, close connections between the personnel involved, and the absence of executed written agreements, this Court cannot find support for Defendants' argument that this structure represents ongoing, arm's length business relationships. (Vacco Decl ¶ 61.)  Instead, this manner of operation, when considered along with the evidence of the high incidence of inappropriate tactics used by the initial collection agents, is more supportive of Plaintiffs' allegation that the nominal corporate separation was a tactic to allow a "payment processor" to generate a clean record of a consumer's agreement to pay, one that is removed from the initial abusive tactics used. (Pls Mem of Law at 10-11.)

Finally, Defendants argue that the return of the Jacksonville office space to "Ross, Delong," an entity also occupying the Jacksonville office and collecting on Vantage Point accounts, is a "fatal flaw" in Plaintiffs' case. (Defs' Mem in Opp'n at 5.) Defendants fail to develop the argument that where, as here, there is significant evidence of Defendants' common control of debt collection activities, the failure to bring one related entity under control of the Receiver precludes the conclusion that a common enterprise exists. <u>See generally</u> <u>F.T.C. v. Tax Club, Inc.</u>, 994 F. Supp. 2d at 470-71

(rejecting the defendants' bare assertion that the continued operation of certain businesses but not others precluded a finding of common enterprise).

In short, there is little evidence at this stage of the proceedings from which this Court could conclude that the corporate distinctions were anything more than nominal. Instead, this record supports the conclusion that the entities at issue operated as a "maze of interrelated companies."  Delaware Watch Co., 332 F.2d at 746.  Plaintiffs have therefore established they have a fair and tenable chance of proving Defendants operated as a common enterprise.

**D.    Individual Liability**

"Individual defendants may be liable for corporate acts or practices if they (1) participated in the acts or had authority to control the corporate defendant and (2) knew of the acts or practices." F.T.C. v. Medical Billers Network, Inc., 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008) (citing F.T.C. v. Amy Travel Serv., 875 F.2d 564, 573 (7th Cir. 1989), *cert denied*, 493 U.S. 954 (1989)).  "Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." Amy Travel Serv., 875 F.2d at 573; Medical Billers Network, Inc., 543 F. Supp. 2d at 320.  The "knowledge requirement may be fulfilled by showing that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." Amy Travel, 875 F.2d at 574 (internal quotation marks omitted).

With one exception, Defendants do not dispute that the individual defendants here have the authority to control one or more of the Corporate Defendants, as evidenced by, among other things, bank signatory cards, incorporation documents, or other filings.[11] (Davis Decl PX01 Exs A-D, S-AA, XX); see Tax Club, Inc., 994 F. Supp. 2d at 471-73; see also F.T.C. v. Five-Star Auto Club, 97 F. Supp. 2d 502, 538 (S.D.N.Y. 2000) (individual's assumption of officer role and possession of authority to sign documents on behalf of the corporation demonstrate the requisite control over the corporation to be held liable under the FTCA).   Defendants argue that Defendant VanDeViver cannot be held individually accountable because she sold Vantage Point to Defendant MacKinnon in 2010. (Vacco Decl ¶¶ 18-19.)   Although this transaction was memorialized in an agreement, the sale price of $10.00 (ten dollars) undermines the conclusion that this was an arm's length transaction. (Vacco Decl Ex 1.) Defendants also do not dispute that VanDeViver was never removed as a signatory on Vantage Point's bank accounts.   (Davis Decl PX01 Ex S.) Further, VanDeViver was the authorized representative for Vantage Point on numerous wire transfers as late as November 2014. (Davis Decl PX34 ¶ 22 Ex L (indicating identification was confirmed by driver's license).) She signed a Vantage Point corporate resolution as a director in 2012 which, notably, forwarded 5% of Vantage Point's shares to Defendant Burdorf. (Davis Decl PX01 ¶ 60 Ex XX.)   VanDeViver also applied for a P.O. Box on behalf of both Vantage Point and Payment Management Solutions in September 2014. (Davis Decl PX01 Ex BBB.)

---

[11] Indeed, Defendants' opposition to the present motion is almost exclusively limited to challenging Plaintiffs' argument that a common enterprise exists.

With respect to the knowledge requirement, in light of the unrefuted evidence regarding the individual Defendant's involvement in the Corporate Defendants' day-to-day operations, the prevalent documentation of aliases, false phone numbers, and inappropriate scripts in the shared spaces, as well as the inter-entity communication noted above, this Court finds that Plaintiffs have submitted sufficient evidence that the individual Defendants had, at minimum, an "awareness of a high probability of fraud along with an intentional avoidance of the truth."  Amy Travel, 875 F.2d at 574.

## E.      Likelihood of Success on the Merits

Briefly, because Defendants also raise no argument in opposition on this point, Plaintiffs have submitted evidence supporting the conclusion that they have a fair and tenable chance of succeeding on each of their claims.  Specifically, the consumer declarations, scripts, and recovered call recordings tend to establish the following conduct is attributable to Defendants' common enterprise: (1) making false representations to consumers regarding Defendants' identities, location and business purposes, including stating that they are calling from or on behalf of a law firm or government agency (see e.g. PX07, PX18, PX26, PX28 (consumer declarations); PX37 Ex AH; see Davis Decl PX01 ¶ 68; McAlvanah Decl PX39 ¶ 6); (2) threatening debtors with arrest on criminal charges, the filing of a civil suit, or similar consequences for non-payment (see e.g. PX02, PX05-PX15, PX17-PX30 (consumer declarations); PX34 Exs J, M; McAlvanah Decl PX39 ¶ 7); (3) making unlawful contact with third parties (such as family, friends, and employers) and disclosing information, including false information such as impending arrest, about the purported debt (see e.g. PX17, PX30 (consumer declarations); McAlvanah Decl PX39 ¶ 8); (4) failing to provide consumers with

statutorily required information (<u>see e.g.</u> PX05-PX09, PX12-14, PX19-PX21, PX27 (consumer declarations)); and (5) charging consumers illegal processing fees (<u>see e.g.</u> PX05, PX06, PX09, PX22, PX25; <u>see generally</u> Davis Decl ¶ 68 (linking certain phone numbers used to make fraudulent or abusive calls to consumers with Defendants' phone accounts).

## F.   Balance of Equities

As noted above, under the FTCA, public equities must receive greater weight than private equities in a court's determination whether to grant a preliminary injunction. <u>Sun and Sand Imports, Ltd., Inc.</u>, 725 F.2d at 188; <u>see</u> <u>World Travel Vacation Brokers, Inc.</u>, 861 F.2d at 1029; <u>see also</u> <u>Crescent Publ'g Grp., Inc.</u>, 129 F. Supp. 2d at 319. Here, Plaintiffs argue that the requested injunctive relief is necessary for the protection of consumers from Defendants' systematic abusive debt collection practices. Specifically, Plaintiffs assert that the asset freeze and receivership provisions are required to prevent Defendants from expending funds improperly obtained from consumers and to ensure that this Court retains the ability to fashion an appropriate remedy, as well as to prevent the possible destruction of evidence during litigation. (Pls' Mem of Law at 33-35; Pls' TRO Mem of Law at 33-37.)  Defendants do not address these arguments, therefore they have not raised any private interests for the Court to consider at this time.

This Court finds the requested preliminary injunction to be in the public interest. A district court has the authority to order "ancillary relief necessary to accomplish complete justice" under Section 13(b) of the FTCA. <u>F.T.C. v. Verity Int'l</u>, No. 00 CIV. 7422(LAK), 2002 WL 44126, *2 (S.D.N.Y. Jan. 11, 2002) (quoting <u>F.T.C. v. H.N. Singer,</u>

Inc., 668 F.2d 1107, 1113 (9th Cir.1982).) Accordingly, injunctive relief is appropriate to prevent the dissipation of assets necessary to assure that a court has the ability to fashion the appropriate relief for consumers. See Int'l Controls Corp. v. Vesco, 490 F.2d 1334, 1347-48 (2d Cir. 1974), cert denied, 417 U.S. 932 (1974); see also F.T.C. v. U.S. Oil & Gas Corp., 748 F.2d 1431, 1434 (11th Cir. 1984). To that end, Plaintiffs argue (and Defendants do not dispute) that, of the $21 million deposited into the Vantage Point Services' bank account from January 2012 and October 2014, over $19 million has been dissipated by way of wire transfers or other non-check debits. (Pls' TRO Mem of Law at 37; Davis Decl PX01 ¶¶ 14-17.) Plaintiffs assert that over $3 million of those transfers appear to have been made to entities closely related to the individual Defendants and are not otherwise substantiated as being for goods or services received. (Pls' Mem of Law at 35 (citing Morrisey Decl ¶¶ 18-29).) This Court further notes that, despite the evidence that millions of dollars in funds that have been collected by Defendants over the last few years, the Receiver has only been able to effect a turnover of less than $400,000, some of which has already been necessarily expended on payroll and other administrative matters. The balance of equities therefore weighs in favor of granting the preliminary injunction as requested.

### III. CONCLUSION

Upon consideration of the parties' submissions, this Court concludes that Plaintiffs have a fair and tenable chance of ultimate success on the merits, and that the balance of equities favors imposing the injunctive relief requested. see Crescent Publ'g Grp., Inc., 129 F. Supp. 2d at 319.

## IV.    ORDERS

IT HEREBY IS ORDERED that Plaintiffs' Motion for a Preliminary Injunction Order with an Asset Freeze, Continued Appointment of a Receiver, and Other Equitable Relief (Docket No. 34) is GRANTED.

SO ORDERED.

Dated: May 15, 2015
Buffalo, New York

<u>/s/William M. Skretny</u>
WILLIAM M. SKRETNY
Senior United States District Judge